**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: S.T.B.-R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| APPEAL OF: J.M.R., FATHER | No. 1387 EDA 2015 |

Appeal from the Decree March 26, 2015
In the Court of Common Pleas of Philadelphia County
Domestic Relations at No(s): CP-51-DP-0000209-2013
DP-51-AP-0000133-2015

BEFORE:  GANTMAN, P.J., MUNDY, J., and MUSMANNO, J.

MEMORANDUM BY MUNDY, J.:                **FILED FEBRUARY 02, 2016**

Appellant, J.M.R. (Father), appeals from the decree entered March 26, 2015, involuntarily terminating his parental rights to his minor daughter, S.T.B.-R., born in January 2007.[1]  After careful review, we affirm.

_____

[1] The trial court docket indicates that the parental rights of S.T.B.-R.'s mother, S.B. (Mother), were terminated by a separate decree entered July 6, 2015.  Mother is not a party to this appeal.  Additionally, on July 6, 2015, this Court entered an order *per curiam*, indicating that Father's counsel had failed to file a docketing statement, and remanding the case to the trial court in order to determine whether Father had been abandoned by counsel.  On July 10, 2015, Father's counsel filed a docketing statement.  The trial court held a hearing later that day, during which Father's counsel indicated that she had not abandoned Father.  *See* N.T., 7/10/15, at 4.  Father's counsel continues to represent him on appeal, and she has filed a brief on Father's behalf.

The trial court summarized the factual and procedural history of this matter as follows.

On January 29, 2013, [the Department of Human Services of Philadelphia County ("DHS")] received a Child Protective [S]ervices ("CPS") report alleging that [S.T.B.-R.]'s eldest sibling was afraid to return home due to [M]other's untreated mental health issues. The report also alleged that [S.T.B.-R.]'s mother showed erratic behavior, suffered from anxiety, and appeared to be under the influence of drugs. [S.T.B.-R.] resided with [M]other since Father was incarcerated. On January 29, 2013[,] DHS went to [S.T.B.-R.]'s school and learned that [S.T.B.-R.] was not enrolled in school. On the same day, DHS visited [M]other's home[.] [M]other was present and stated to DHS that "she could not leave home because Michelle Obama was on her way to pick her up and escort her to the White House". On January 29, 2013, DHS obtained an Order for Protective Custody ("OPC") and [S.T.B.-R.] was placed with [S.T.B.-R.'s adult] sister. At that time Father was incarcerated at Curran-Fromhold Correctional. On January 31, 2013, at a Shelter Care hearing, the OPC was lifted and the temporary commitment to DHS was ordered to stand.

At the Adjudicatory hearing, on March 8, 2013, the [trial] court discharged the temporary commitment, [and S.T.B.-R.] was adjudicated dependent and placed in foster care thr[ough] Friendship House. On May 21, 2013, a Family Service Plan ("FSP") was developed for [M]other. At a Permanency Review Hearing on October 4, 2013, the trial court found that Father was incarcerated at SCI Camp Hill and that a criminal Stay Away Order was issued against Father. Father was referred to the CEU ("Clinical Evaluation Unit") for a drug screen when he avails himself. Father was found in minimal compliance. Visits with the Father were held under advisement until further order of the court. The reason for the suspension of Father's visits was the fact that [S.T.B.-R.] witnessed episodes of domestic violence

between Father and [M]other. Father is in [j]ail due to stabbing Mother; therefore, the criminal and dependency court had imposed a Stay Away Order against Father.

At [a] Permanency Review Hearing, on January 31, 2014 and May 2, 2014, DHS was ordered to do outreach to Father. At [a] Permanency Review Hearing, on July 2, 2014, the trial court found that DHS reached out to Father at Huntington State Correctional Institution. Father's minimum release date is August 2016 and his maximum release date is August 2020. The trial court also ordered Father to not have visits with [S.T.B.-R.], unless recommended by [S.T.B.-R.]'s therapist. Finally, the trial court found that Father's compliance with the Permanency plan was not applicable. At a Permanency Review Hearing, on October 3, 2014, the trial court found that Father remained incarcerated and that Wordsworth [Community Umbrella Agency ("CUA")] also reached out to Father. The trial court ordered Wordsworth CUA to continue outreach with [Father's] prison social worker to set up an interview with Father to inform him about his [Single Case Plan ("SCP")] objectives and recommendations. Father's visitations remained suspended.

Trial Court Opinion, 7/20/15, at 1-2 (citations to the record omitted).

On March 4, 2015, DHS filed a petition to terminate Father's parental rights involuntarily.[2] A termination hearing was held on March 26, 2015,

_____

[2] The order also stated "[t]he adoption of [S.T.B.-R.] may continue without further notice to or consent of [Father.]" Trial Court Order, 3/26/15. However, because Mother's rights had not been terminated, the order did not change S.T.B.-R.'s permanency goal. The trial court docket indicates that S.T.B.-R's permanency goal was changed to adoption on July 6, 2015, following the termination of Mother's rights.

and the trial court entered its decree terminating Father's parental rights that same day. Father timely filed a notice of appeal on April 24, 2015, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

On appeal, Father raises the following issues for our review.

> 1. Did DHS make reasonable efforts to assist Father in being reunited with [S.T.B.-R.]?
>
> 2. Did [DHS] sustain it's [*sic*] burden that Father's rights should be terminated?
>
> 3. Did [DHS] sustain it's [*sic*] burden regarding the requirements of 23 Pa.C.S.A. § 2511 (b)?

Father's Brief at 5.

We consider Father's claims mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

- 4 -

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), and (b). We need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> …

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted). "[A] parent's incarceration is relevant to the section (a)(2) analysis and, depending on the circumstances of the case, it may be dispositive of a parent's ability to provide the 'essential parental care, control or subsistence' that the section contemplates." *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014) (discussing *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012)).

Instantly, the trial court found that Father's incarceration has rendered him incapable of providing S.T.B.-R. with essential parental care, control, and subsistence, and that Father will be unable to remedy the causes of his parental incapacity. Trial Court Opinion, 7/20/15, at 7-8. The trial court emphasized that Father has not made efforts to remain in contact with S.T.B.-R., that Father has failed to complete any of his FSP or SCP objectives, and that it is unclear when Father will be released from incarceration. *Id.* at 5-8.

Father argues that the trial court erred by terminating his parental rights because DHS failed to provide reasonable efforts to assist him in being reunited with S.T.B.-R. Father's Brief at 17-22. Specifically, Father alleges

that DHS failed to make sufficient efforts to have S.T.B.-R. placed in therapy, so that she could begin visitation with Father. *Id.* at 19-22. Father also contends that DHS failed to present clear and convincing evidence that his parental rights should be terminated. *Id.* at 22-32. Father insists that he was unable to maintain contact with S.T.B.-R. due to the stay away order, but that he consistently inquired about S.T.B.-R.'s well-being. *Id.* at 25-26, 28, 31. Father also asserts that the FSPs he received contained objectives for Mother only, and that he was not advised of the objectives he needed to complete until less than a month prior to the termination hearing. *Id.* at 26-29, 31. Father states that he completed two parenting-related programs while incarcerated, and that he was prevented from completing additional programs due to prison policy. *Id.* at 30-31.

After a thorough review of the record, we conclude that the trial court did not abuse its discretion by involuntarily terminating Father's parental rights to S.T.B.-R. Initially, we reject Father's claim that his parental rights should not have been terminated because DHS failed to provide him with reasonable reunification efforts. Our Supreme Court recently held that reasonable reunification efforts are not necessary to support a decree terminating parental rights pursuant to Section 2511(a)(2). We have discussed the Court's decision as follows.

> In **In re D.C.D.**, ___ Pa. ___, 105 A.3d 662 (2014), our Supreme Court analyzed the language of Section 2511(a)(2) of the Adoption Act, as well as Section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351. The

> Court reasoned that, while "reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child," neither of these provisions, when read together or individually, requires reasonable efforts. The Court also concluded that reasonable efforts were not required to protect a parent's constitutional right to the care, custody, and control of his or her child.

*In re Adoption of C.J.P.*, 114 A.3d 1046, 1055 (Pa. Super. 2015) (some citations omitted).

Moreover, our review of the record confirms that DHS presented clear and convincing evidence in support of its termination petition. During the termination hearing, DHS presented the testimony of CUA case manager, Ms. Monique Cliett. Ms. Cliett explained that she was assigned to this case in February of 2015. N.T., 3/26/15, at 4, 23. Ms. Cliett sent Father a letter introducing herself as the new case manager, and spoke to Father on the phone "several times." *Id.* at 13, 25, 35. Ms. Cliett reported that an SCP was prepared at the end of December 2014, and that Father's SCP objectives were to attend anger management and parenting programs. *Id.* at 13, 32-33. Ms. Cliett noted that it is the policy of the CUA to send a copy of the SCP to a child's parents, and that she also spoke with Father about these objectives. *Id.* at 13-14, 32, 48. Ms. Cliett recalled that Father signed up for anger management classes in "the beginning of March" of 2015, but is on a waiting list. *Id.* at 14-15, 25. She did not have

documentation to indicate that Father had signed up for parenting classes.[3] *Id.* at 15, 26.

Ms. Cliett further testified that Father has been incarcerated since before S.T.B.-R. was placed in foster care, and that Father's visits with S.T.B.-R. were suspended pursuant to a court order. *Id.* at 11-12, 14, 25, 33-35. As a result, Ms. Cliett believed that Father has not had any contact with S.T.B.-R. since the case began. *Id.* at 20-21. Father did not send letters or gifts to S.T.B.-R., and he did not ask to send letters or gifts. *Id.* at 20, 36. However, Father asks how S.T.B.-R. is doing. *Id.* at 41.

DHS also presented the testimony of DHS social worker, Gabriel Li. Mr. Li explained that he worked on S.T.B.-R.'s case for approximately eight months to a year, starting in January 2013. *Id.* at 54. Mr. Li agreed that Father had no contact with S.T.B.-R. during that time, because Father was incarcerated, and because Father's visits with S.T.B.-R. had been suspended by court order. *Id.* at 55. Father's visits were suspended due to Father's acts of domestic violence against Mother, including a stabbing witnessed by

---

[3] During cross-examination, Father's counsel reviewed the documentation Ms. Cliett received from Father concerning his attempts at enrolling in programs while incarcerated. N.T., 3/26/15, at 42. According to Father's counsel, Father sent a request to prison authorities on March 8, 2015, asking to be enrolled "in counseling and parenting classes and outpatient anger management." *Id.* at 44. On March 9, 2015, Father sent a similar request to the prison's psychological department asking to be enrolled in "'mental and behavioral health, outer stress inner calm group, grief and losses group, positive mental attitude group, cage your rage anger control and recovery group and beyond stress.'" *Id.*

S.T.B.-R. *Id.* at 55, 63. Mr. Li noted that Father wrote to him to request visitation and ask how S.T.B.-R. was doing. *Id.* at 55, 61. Father also sent a birthday card for S.T.B.-R. *Id.* at 61-62. However, Father never indicated to Mr. Li that he had completed or was attending any programs while incarcerated. *Id.* at 59-60.

Finally, Father testified on his own behalf. Father explained that he was incarcerated on August 8, 2012. *Id.* at 70. Father was convicted of aggravated assault, and currently is serving a four to eight year sentence, with a minimum release date in August 2016, and a maximum release date in August 2020. *Id.* at 75-76, 84. Father recalled that he first received documentation indicating that S.T.B.-R. had been removed from Mother's care in February 2013. *Id.* at 70. Father wrote to DHS and began corresponding with Mr. Li. *Id.* at 71. According to Father, Mr. Li never informed him that he should be taking classes while incarcerated. *Id.* Additionally, Father stated that the FSPs he received did not require him to do anything, and referenced only Mother. *Id.* at 71-72. Father reported that he completed a victim's awareness program while incarcerated, as well as programs entitled "Inside Out Dad" and "Reading to [Y]our Children." *Id.* at 72, 76. Father indicated that he has attempted to enroll in several other programs, but "they don't let you take them until you're a certain amount of time to your minimum. … [Y]ou don't see those classes until you get to your minimum. At least six months into your minimum." *Id.* at 74-76.

Father admitted that he has not spoken to S.T.B.-R. since prior to his incarceration. *Id.* at 82. Father stated that he attempted to write to S.T.B.-R.'s foster mother on one occasion, but that he later received a letter from "[s]omebody else" indicating that he should not. *Id.* at 73-74. Father explained, "I wasn't gonna keep written [sic] because I wasn't really trying to push and get in any type of trouble." *Id.* at 74. Father acknowledged that he has no job waiting for him upon his release, but claimed that he is "doing a trade up here that's going to help me with employment," and that he will be able to reside at his father's home. *Id.* at 77-78.

Accordingly, the record supports the trial court's conclusion that Father's incarceration renders him incapable of providing S.T.B.-R. with essential parental care, control, or subsistence necessary for S.T.B.-R.'s physical or mental well-being. Moreover, Father cannot, or will not, remedy his parental incapacity. Father has been incarcerated since August 8, 2012, and it is not clear when Father will be released. If Father's parental rights are not terminated, S.T.B.-R. could be left to languish in foster care until Father completes his maximum sentence in 2020, and possibly later. Even assuming that Father is released upon completing his minimum sentence in August 2016, the record demonstrates that Father's incapacity will not be remedied. Father has been either unwilling or unable to stay in contact with S.T.B.-R. during his incarceration, and he has yet to complete the necessary anger management and parenting programs. Father has no employment

waiting for him upon his release. As such, Father will not be able to immediately provide essential parental care, control, or subsistence.

We next consider whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

Here, the trial court found that there is no bond between Father and S.T.B.-R., that S.T.B.-R. would not suffer irreparable harm if Father's parental rights are terminated, and that termination would be in S.T.B.-R.'s best interest. Trial Court Opinion, 7/20/15, at 9. The trial court emphasized that S.T.B.-R. has had no recent contact with Father, and that S.T.B.-R. is thriving in the care of her foster mother, with whom she is bonded. *Id.* Father argues that the testimony presented by DHS during the termination

hearing was insufficient to discern whether Father and S.T.B.-R. share a bond, and whether S.T.B.-R. would be harmed if Father's parental rights are terminated. Father's Brief at 32-34.

We again discern no abuse of discretion. Ms. Cliett testified that S.T.B.-R. gets along well with her pre-adoptive foster mother, and that they are bonded. N.T., 3/26/15, at 21, 28-29. S.T.B.-R. does not ask about Father, and appears to be "fine" having no contact with him. *Id.* at 21, 28, 49-50. Similarly, Mr. Li reported that he visited S.T.B.-R. on a monthly basis, and that S.T.B.-R. never mentioned Father. *Id.* at 56. When Mr. Li asked S.T.B.-R. about Father, she had little to say about him. *Id.* at 68-69. Mr. Li opined that there is no bond between Father and S.T.B.-R. due to Father's incarceration and lack of contact, and that S.T.B.-R. would not suffer irreparable harm if Father's parental rights are terminated. *Id.* at 59-60. He stated that S.T.B.-R. is thriving in foster care, and that S.T.B.-R. and her pre-adoptive foster mother have an "extremely strong bond." *Id.* at 59, 61, 63.

Thus, the record confirms that S.T.B.-R. is bonded with her pre-adoptive foster mother. In contrast, S.T.B.-R. has not seen or spoken to Father since prior to August 2012, and does not mention Father in conversation. S.T.B.-R. appears to have no bond with Father, and she will not suffer irreparable harm if Father's parental rights are terminated. It is

clear that S.T.B.-R.'s needs and welfare will be served by terminating Father's parental rights, and permitting S.T.B.-R. to be adopted.

Based on the foregoing, we conclude that the trial court did not abuse its discretion by involuntarily terminating Father's parental rights to S.T.B.-R. Accordingly, we affirm the trial court's March 26, 2015 decree involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/2/2016

- 15 -